NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0331n.06

No. 14-3896

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jun 16, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| FATMATA KANU, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
| | ) | BOARD OF IMMIGRATION |
| LORETTA E. LYNCH, United States Attorney | ) | APPEALS |
| General, | ) | |
| | ) | OPINION |
| Respondent. | ) | |
| | ) | |

**BEFORE:** **BOGGS, ROGERS, and STRANCH, Circuit Judges.**

**JANE B. STRANCH, Circuit Judge.** Fatmata Kanu, a citizen of Sierra Leone, petitions

for review of the Board of Immigration Appeals's opinion holding that she is removable for

procuring admission to the United States by fraud or willful misrepresentation and that she filed

a frivolous application for asylum. Kanu also challenges the termination of her derivative

refugee status by the United States Citizenship and Immigration Services. For the reasons that

follow, we **DENY** the petition.

## I. BACKGROUND

### A. Admission & Medical Records

Fatmata Kanu was admitted to the United States in April 2003 as the unmarried child of a

refugee. The United States Immigration and Naturalization Service (INS), as it was then, found

that Kanu qualified for admission and derivative refugee status pursuant to 8 U.S.C.

§ 1157(c)(2)(A). That finding was based, in part, on a Form I-590 for "Registration for Classification as Refugee" that Kanu submitted in 2002 while living in a refugee camp in The Gambia. On her I-590, Kanu indicated that she was born in Lunsar, Sierra Leone on January 10, 1986, and that she had never been married and had no spouse. Kanu also received and signed, with the assistance of an interpreter, an "RE-3 Notice of Pre-Departure Marriage & Declaration," in which she declared that she was "not married" and that she understood her admission to the United States was contingent upon her remaining unmarried and under the age of 21. "Should you marry prior to your arrival in the United States," the RE-3 warned, "failure to disclose your marriage at the time of your admission will be viewed by the INS as misrepresentation. Such misrepresentation could result in the termination of your refugee status and removal from the United States." (R. 9, PageID 977.)

In January 2003, prior to her admission, Kanu underwent a medical examination conducted by the United States Department of State at a medical center in The Gambia. The "[p]hysical [e]xamination" section of a "medical history and physical examination worksheet" from that appointment includes a checked box indicating that Kanu's "[h]earing and ears" were normal. (*Id.* at PageID 688.) After her admission to the United States, however, Kanu sought treatment at the Michigan Ear Institute complaining of hearing loss in both ears. A health history questionnaire that was completed in connection with one visit to the Ear Institute in October 2003 asked if Kanu "had any serious injury[.]" (*Id.* at PageID 624). On the form, which was signed by Kanu's mother, "No" was checked in response. A doctor at the Ear Institute examined Kanu with her family members acting as translators and concluded that she suffered from hearing loss, tinnitus, and otorrhea. The doctor also noted that "[i]t seems that the patient has had problems with ear infections all her life, even as a child." (*Id.* at PageID 628.)

**B.      Application for Adjustment of Status**

In 2005, Kanu prepared, signed, and submitted an I-485 Application to Register Permanent Residence or Adjust Status with the help of an immigration lawyer.   The I-485 indicated that Kanu was married to a man named Abdoulai Bundu, and a G-325A Biographic Information form that Kanu signed in July 2005 listed the date and place of her marriage to Bundu as February 5, 2002 in The Gambia.  Kanu also attached a Gambian marriage certificate to her I-485 that appeared to confirm the details of her and Bundu's marriage.   When an immigration officer presented Kanu with the conflicting documents in an interview with the United States Citizenship and Immigration Services (USCIS) in June 2006, however, Kanu told the interviewing officer that she was not really married to Bundu.   The officer nevertheless concluded that Kanu was indeed married prior to her admission and that she appeared to be inadmissible due to prior fraud or willful misrepresentation—namely, her claim on the I-590 that she was unmarried when she applied for refugee status.   The officer informed Kanu that she could submit an I-602 application for waiver of grounds of excludability.

**C.      Application for Waiver of Grounds of Excludability**

Kanu signed and submitted an I-602 Application by Refugee for Waiver of Grounds of Excludability on August 30, 2006.  In that application, Kanu stated:

> I signed a statement on 11/18/2002 that said I was single to obtain admission as a refugee. . . .   That day I was approved refugee status, however, I was married at the time to Abdoulai Bundu (DOB: 05/07/1979).   I married Mr. Bundu on 02/05/2002 in Gambia.

(*Id.* at PageID 697.)   In support of her request for waiver on humanitarian grounds, Kanu explained:

> Although I was married when I received refugee status, I request a waiver of the grounds of inadmissibility because returning to

> Gambia or Sierra Leone would be devastating. When I was in Sierra Leone, I was shot by the rebels and lost much of my hearing. Returning would put me in terrible danger.

(*Id.*) In a subsequent notarized letter dated June 20, 2007, Kanu stated: "I got married in Gambia without realizing that this would affect my immigration status. . . . I apologize for not telling the truth because I was scared to be left alone without my family." (*Id.* at PageID 979.) USCIS denied Kanu's I-602 application for waiver and her I-485 application for adjustment of status in August 2007.

### D.      Termination of Refugee Status

On January 10, 2008, USCIS sent Kanu a notice of intent to terminate her refugee status, explaining that Kanu was "not entitled to admission to the United States as a derivative child of [a] refugee" in light of her Gambian marriage. (*Id.* at PageID 770.) The notice gave Kanu 30 days to present evidence showing why her status should not be terminated. Kanu responded via counsel in a letter dated February 8, 2008. Kanu argued, among other things, that she "WAS a refugee when she entered the United States because she was in fact persecuted in Sierra Leone." (*Id.* at PageID 776 (emphasis in original).) She also argued "that despite her previous representations, she is not now, nor ever has been married to Abdoulai Bundu or anyone else." (*Id.* at PageID 777.)

In support of her persecution argument, Kanu attached an affidavit and a draft I-589 application for asylum and withholding of removal that she said she intended to file shortly in the course of removal proceedings that had already begun. Kanu stated in her affidavit that rebels attacked her house in Sierra Leone in 1999 and that "one of the soldiers shot at me, and the bullet passed very close to my ear and damaged my hearing." (*Id.* at PageID 780.) She also explained, with respect to her marital status, that she was "tricked into helping a man named Abdoulai

Bundu" who "was [her] boyfriend for a time while [she] was living with [her] family in the refugee camp in Gambia." (*Id.* at PageID 781.) According to Kanu's affidavit, Bundu pressured her to "help him get out of Africa" and sent her "a marriage certificate that he had fraudulently obtained, stating that [the couple] w[as] married in Banjul, Gambia, on February 5th, 2002, which was not true at all." (*Id.*) Kanu apologized for going along with Bundu's purported plan and explained that because she "thought admitting this lie would get [her] in more trouble[,]" she "just went along with it when [she] was told [she] needed to file a waiver to get around this first lie." (*Id.* at PageID 782.) Kanu maintained, however, that she was not nor had she "ever been married to Abdoulai Bundu." (*Id.*) USCIS terminated Kanu's refugee status on May 12, 2008.

### E.    Removal Proceedings & Application for Asylum

Meanwhile, in August 2007, the government served Kanu with a Notice to Appear (NTA) before a federal immigration judge (IJ) on charges that she was removable under 8 U.S.C. § 1182(a)(6)(C)(i) and (a)(7)(A)(i)(I). Kanu first appeared for preliminary hearings before the IJ on March 11 and July 29, 2008. Her removal hearings continued periodically over the course of five years, always with Kanu represented by counsel, until the last hearing on March 26, 2013. During her removal proceedings, Kanu renewed her I-485 application for adjustment of status and her I-602 application for waiver of grounds of excludability. She also filed an I-589 application for asylum and withholding of removal with the same accompanying affidavit she previously submitted to contest the termination of her refugee status. Kanu, her mother, and a man identified as Kanu's current husband, Abu Turay, all testified during the proceedings. Both Kanu and the government filed supporting exhibits. For example, Kanu presented what appears to be a document from the Gambian government certifying that Kanu was never married in that

country. The government, for its part, submitted copies of Kanu's previously filed I-590, RE-3, original I-602, and notarized 2007 letter.

In February 2013, as the removal proceedings were nearing conclusion, the government filed a Form I-261 withdrawing the charges in the 2007 NTA and instead charging Kanu with removability under 8 U.S.C. § 1227(a)(1)(A) on two alleged grounds: (1) that she had sought to procure admission to the United States by fraud or willfully misrepresenting a material fact and was therefore inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i); and (2) that she was not in possession of a valid entry document at the time she applied for admission under 8 U.S.C. § 1182(a)(7)(A)(i)(I). Kanu's counsel conceded that no further evidentiary hearings were necessary in order for the IJ to rule on the new charges. The IJ ruled against Kanu in an opinion issued on May 1, 2013, finding, among other things, that Kanu was removable as charged and that she had filed a frivolous application for asylum. The IJ also denied Kanu's applications for asylum and withholding of removal and for waiver of inadmissibility. Kanu appealed to the Board of Immigration Appeals (BIA), arguing that the government had failed to meet its burden of proof with respect to removability or frivolousness, but the Board dismissed her appeal in an opinion issued on August 12, 2014. Kanu timely petitioned this court for review.

## II.      DISCUSSION

Kanu maintains that the government failed to carry its burden of proof regarding her removability and the alleged frivolousness of her asylum application. Where, as here, the BIA reviews the IJ's decision and issues a separate opinion, we review the Board's opinion as the final agency determination and we may consider the IJ's decision to the extent the BIA adopted its reasoning. *Sanchez-Robles v. Lynch*, 808 F.3d 688, 691–92 (6th Cir. 2015). Kanu also challenges the authority of USCIS to terminate her derivative refugee status. Because removal

proceedings and Kanu's appeal to the BIA have concluded, we may now review intermediate agency decisions including termination of refugee status. *See Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 497 (6th Cir. 2014).

## A. Removability

We review removability determinations under the "substantial evidence" standard. *Hassan v. Holder*, 604 F.3d 915, 924 (6th Cir. 2010). This deferential standard requires us "to uphold the Board's findings as long as they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Hanna v. Holder*, 740 F.3d 379, 386 (6th Cir. 2014) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). "To reverse under the substantial evidence standard, the evidence must be so compelling that no reasonable factfinder could fail to find the facts were as the alien alleged." *Id.* (quoting *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005)). Put another way, we may reverse the Board's factual findings only if we conclude "that the evidence not only supports a contrary conclusion, but indeed *compels* it." *Hassan*, 604 F.3d at 925 (emphasis in original) (quoting *Mullai v. Ashcroft*, 385 F.3d 635, 638 (6th Cir. 2004)).

In Kanu's removal proceedings, the government bore the burden of showing by clear and convincing evidence that Kanu is removable because she obtained admission to the United States by fraud or willful misrepresentation of a material fact. *See* 8 U.S.C. §§ 1182(a)(6)(C)(i), 1227(a)(1)(A), 1229a(c)(3)(A); *Hassan*, 604 F.3d at 925. The BIA found "that the evidence presented . . . consisting of documents created prior to these proceedings, is sufficient to meet [the government's] burden of proof in establishing the respondent's inadmissibility . . . for having misrepresented her marital status at the time she obtained refugee status." (R. 9 at

PageID 9.)[1] On petition for review, Kanu essentially argues that because the IJ and BIA found her not to be credible, the government cannot rely on the statements in Kanu's original I-485, I-602, and notarized 2007 letter as clear and convincing evidence that Kanu was married to Bundu at the time of her admission to the United States. This argument errs in equating Kanu's statements in those documents with the rest of her testimony in removal proceedings. The statements in Kanu's original I-485 and attachments, original I-602, and notarized 2007 letter are distinguishable because they are effectively party-opponent admissions and thus reliable in a way that much of Kanu's testimony was found not to be. Having been informed of the consequences of being married at the time of her admission to the United States, Kanu nevertheless admitted in her I-485 and attachments, I-602, and notarized 2007 letter—all of which she submitted to the government—that she was indeed married to Bundu when she entered the United States in April 2003. Considered against the backdrop of the record as a whole, these admissions against her own interest qualify as reasonable, substantial, and probative evidence of Kanu's marital status at the time of admission. *See Hanna*, 740 F.3d at 386. Because the administrative record in this case does not compel a contrary conclusion, we are prohibited from reversing the BIA's finding that the government met its burden with respect to removability. *See Hassan*, 604 F.3d at 925.

### B. Frivolousness

When reviewing a finding that a petitioner filed a frivolous asylum application, "we review questions of law de novo and uphold factual findings if they are supported by substantial evidence." *Yousif v. Lynch*, 796 F.3d 622, 628 (6th Cir. 2015). An asylum application is frivolous under the Immigration and Nationality Act (INA) and its implementing regulations "if

---

[1]Because the BIA specifically mentioned the government's meeting its burden of proof, Kanu's argument that "the Board improperly placed the burden of proof upon Ms. Kanu" (Pet'r's Br. at 12–13), is unavailing.

any of its material elements is deliberately fabricated." 8 C.F.R. § 1208.20.[2] The consequences

for filing a frivolous application are dire: "If the Attorney General determines that an alien has

knowingly made a frivolous application for asylum and the alien has [been advised of the

consequences of filing a frivolous application], the alien shall be permanently ineligible for any

benefits under this chapter," 8 U.S.C. § 1158(d)(6), which include being regarded as lawfully

admitted for permanent residence, contrary to Kanu's arguments. Accordingly, "an IJ is

permitted to make such a finding only after complying with several procedural safeguards."

*Yousif*, 796 F.3d at 627. These safeguards include: (1) notice to the alien of the consequences of

filing a frivolous application, (2) a specific finding by the IJ or the BIA that the alien knowingly

filed a frivolous application, (3) sufficient record evidence to support the finding that a material

element of the asylum application was deliberately fabricated, and (4) an indication that the alien

has been afforded sufficient opportunity to account for any discrepancies or implausible aspects

of the claim. *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007). In light of the severe

consequences triggered by a frivolous application finding, "the preponderance of the evidence

must support an [IJ's] finding that the [petitioner] knowingly and deliberately fabricated material

elements of the claim." *Lazar v. Gonzales*, 500 F.3d 469, 475 (6th Cir. 2007) (alterations in

original) (citation omitted).

We agree with the BIA that the IJ adequately notified Kanu of the consequences of filing

a frivolous application for asylum, satisfying the first procedural safeguard. At a hearing on

February 26, 2009, for example, the IJ informed Kanu that "if you knowingly file a frivolous

application for asylum you w[ill] be barred forever from receiving any benefits under our

---

[2]Kanu's argument that "the frivolous asylum application bar applies only to the application itself, and not affidavits filed with it" lacks merit. (*See* Pet'r's Br. at 28–32.) Kanu's application was based on representations made in her affidavit; there is nothing in our precedent to suggest that material fabrications in her affidavit cannot form the basis of a frivolousness finding.

Immigration Act. . . . [A] frivolous application for asylum contains statements or responses to questions that have been deliberately fabricated." (R. 9, PageID 252.) Kanu was also served with a written notice outlining these consequences. Moreover, the IJ specifically warned Kanu at the February 2009 hearing that he was concerned about inconsistencies in her claims regarding the cause of her ear injury—particularly that the medical records from the refugee camp did not contain any mention of a serious ear injury caused by close proximity to rebel gunfire—and that such concerns, if not addressed, could potentially form the basis of a frivolous application finding. The IJ told Kanu that "at the next hearing we'll talk about [the] possibility [that your ear injury actually occurred in the United States] and you can explain through your medical records and whatever you want to about the Court's concern about that." (*Id.* at PageID 446.) Kanu replied that she understood.

The next hearing with a qualified interpreter took place two years later, on March 28, 2011, at which time the IJ stated that "[n]ow the respondent, if she wants, can testify about the frivolous issue that the Court raised the last time we had an interpreter[.]" (*Id.* at PageID 493.) But Kanu's counsel responded that Kanu wished "to stand on the record" and did not "see any real need to add to what we've stated already." (*Id.* at PageID 497.) The IJ then stated that he was concerned about the report from the Michigan Ear Institute, which indicated that she "didn't have any trauma to [her] ears[,]" and asked Kanu if she needed more time to talk to her lawyer. (*Id.* at PageID 498.) After speaking with Kanu for more than ten minutes in the hallway, Kanu's counsel returned to the courtroom and "reiterate[d] that we stand on the record." (*Id.* at PageID 502.) We agree with the BIA that the IJ afforded Kanu sufficient opportunity to account for any discrepancies or implausible aspects of her claim that her hearing loss resulted from a rebel gunshot in Sierra Leone and that the fourth safeguard is satisfied.

With respect to the second safeguard, the BIA noted, and we agree, that the IJ specifically determined that Kanu "fabricated the connection between the incident she describes with the rebels in Sierra Leone and her hearing loss, which she claims occurred because of an injury sustained during that incident" and also "found that this purported injury went to the heart of [Kanu's asylum] claim because it is the injury upon which she bases her claim of persecution." (*Id.* at PageID 9.) As for the third safeguard, the BIA concluded, and we likewise agree, that the record contained "sufficient inconsistencies . . . to support a determination that material aspects of [Kanu's] claim, as detailed in her most recent asylum application, documentary evidence, and testimony during the proceedings, were deliberately fabricated." (*Id.* at PageID 10.)

Kanu's failure to present credible evidence that the rebel attack took place as she described, combined with her failure to explain inconsistencies in the record evidence— including conflicting testimony about whether her family had to stop at a drugstore in Guinea to purchase medicine to treat her purported ear injury and the absence of any mention of such an injury in her medical records in either The Gambia or the United States—constitute substantial evidence that Kanu fabricated this element of her asylum claim. While Kanu faults the BIA's reliance on the inconsistencies between her testimony and her mother's testimony after the IJ determined that her mother was not a credible witness, the very fact that the record contains so many inconsistent versions of the rebel attack and the events that followed provides substantial evidence for the BIA's conclusion that the story was fabricated. Moreover, as the IJ explained, whether or not Kanu's ear injury was caused by rebel gunfire in Sierra Leone is material to her asylum application because, if "true, it would have served as testimonial evidence of past persecution." (*Id.* at PageID 199.) On this record, Kanu's request that we reverse the BIA with respect to the IJ's frivolousness finding is not warranted.

## C. Refugee Status

Kanu also argues that the USCIS lacked statutory authority to terminate her derivative refugee status except in conjunction with a termination of her mother's status. Essentially, Kanu contends that 8 U.S.C. § 1157(c)(2)(A) entitles her to the same refugee status as her mother. As USCIS correctly explained in its termination letter, however, a spouse or child of a refugee is only entitled to derivative status under the INA "if the spouse or child is admissible . . . as an immigrant under th[e Act]." 8 U.S.C. § 1157(c)(2)(A). Because, for the reasons explained above, we do not disturb the BIA's finding that Kanu was in fact inadmissible under the INA at the time of her admission to the United States, it follows that Kanu is not entitled to the same refugee status as her mother and that the USCIS was within its authority in terminating her derivative refugee status.

## III. CONCLUSION

For the foregoing reasons, the petition for review is **DENIED**.