# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3600

_____

Alejandra Sandoval,               *
                                    *

          Petitioner,          *
                                    *  Petition for Review of an Order of

      v.                     *  the Board of Immigration Appeals.
                                    *

Eric H. Holder, Jr., Attorney     *
General of the United States,     *
                                    *

         Respondent.        *

_____

Submitted: October 19, 2010
Filed: June 14, 2011

_____

Before RILEY, Chief Judge, BYE and MELLOY, Circuit Judges.

_____

BYE, Circuit Judge.

Alejandra Sandoval, a citizen of Mexico, contends section 212(a)(6)(C)(ii) of the Immigration and Nationality Act (INA), which renders inadmissible any alien who makes a false claim to United States citizenship, should not apply to her because, at the time she made the misrepresentation, she was an unaccompanied minor. The immigration judge (IJ) accepted Sandoval's argument and granted her adjustment of status on the basis of her marriage to a United States citizen. The Board of Immigration Appeals reversed, pointing to the lack of authority for the IJ's actions yet refusing to enunciate the controlling standard. On the record before us, we cannot discern whether the Board rejected Sandoval's argument on a wholesale basis,

refusing to exempt from the statute any minors no matter what the age, or whether the Board's analysis was more nuanced and hinged on certain factors that warranted the application of the statute in Sandoval's particular case. Because, as the old saying goes, it is better to light a candle than curse the darkness, and the Board must articulate a sufficient basis for its decision to enable meaningful review, SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947), we remand the matter to the Board with instructions to clarify the standard it uses in applying section 212(a)(6)(C)(ii) to unaccompanied minors and to articulate the reasons Sandoval deserves no relief under that standard.

I

Sandoval was born in 1981 in Mexico. Her mother died when Sandoval was only two, and she was raised by her paternal grandparents. When her grandfather died around her fifteenth birthday, her two older sisters, both United States citizens by birth, decided Sandoval should join them in the United States. Her sister Sandra arranged for Sandoval to cross the border in Tijuana. In the bygone days of lax border enforcement, Sandoval crossed the border easily, which she did by joining a group of Americans who were waived by without much scrutiny. Once in the United States, she settled with her sister Patricia in the Minneapolis area and started attending a local high school in the fall of 1996.

Sandoval found adjustment to her new life difficult. In the fall of the following year, she decided to take a break and visit her relatives in Mexico. On advice of an undocumented friend, she used her sister Sandra's birth certificate to obtain a Minnesota identification card. With the help from a boyfriend, she purchased a plane ticket to Mexico, also in Sandra's name. In late November of 1997, she flew to Mexico where she remained until January of 1998, at the cost of failing all her classes that semester.

As it turns out, returning to the United States was not as easy. On January 10, 1998, Sandoval boarded a flight from Guadalajara to Chicago, with a stopover in Dallas. When passing through the immigration counter at the Dallas/Fort Worth International Airport, she presented Sandra's birth certificate and her Minnesota ID card to the immigration officer. With Sandra being four years older, Sandoval's age according to the documents was twenty, whereas her real age was sixteen. Suspicious of the age discrepancy, the immigration officer referred Sandoval to the secondary inspection, where she was questioned in Spanish by Teresa Vega and two other inspectors. The stories diverge as to how quickly Sandoval confessed. While Sandoval maintains she burst into tears and revealed her identity virtually instantly, Vega insists the truth was harder to come by. According to Vega, Sandoval came clean only after inspectors had confronted her with some receipts bearing her real name and discovered her initials and date of birth engraved on the quinceañera ring she was wearing.

Voluntariness of Sandoval's confession exhausts the list of factual disagreements between the parties. Everyone agrees that, once the truth came out, Vega filled out Form I-213, Record of Deportable Alien, documenting the incident. Under the protocol in effect at the time for cases involving unaccompanied minors, Vega allowed Sandoval to withdraw her application for admission by filing Form I-275, Withdrawal of Application for Admission. As a result, Sandoval avoided the charges of misrepresentation and removal proceedings. With that, Sandoval was sent on her way to Mexico.

However, giving up was apparently not in the teenager's character. Mere days later, Sandoval made her way back to Minnesota with the help of a smuggler. Her life thereafter followed a normal progression: She stayed in the Minneapolis area, earned good grades in high school, eventually graduated, then got a job, then had a daughter and got married. Yet the 1997 airport incident came back to haunt her years later,

when she applied for adjustment of status based on her marriage to a United States citizen.

The problem is that section 212(a)(6)(C)(ii) of the INA renders Sandoval permanently barred from admission into the country by virtue of having made a false claim to United States citizenship. See 8 U.S.C. § 1182(a)(6)(C)(ii)(I). On the basis of that provision, the United States Citizenship and Immigration Services denied Sandoval's application for adjustment of status and placed her in removal proceedings in February of 2004.[1]

During the proceedings before an Immigration Judge, Sandoval argued the permanent admissibility bar should not apply to unaccompanied minor children in the same way it applies to adults. She also alleged she timely retracted her claim to citizenship – particularly if her age is properly taken into account – in which case section 212(a)(6)(C)(ii) does not apply. The IJ was sympathetic to Sandoval's first argument and granted her application for adjustment of status. He was persuaded by the reasoning of the Supreme Court in Roper v. Simmons, 543 U.S. 551 (2005), where the Court struck down the death penalty to punish conduct committed by a defendant during the age of minority. Characterizing the permanent bar to admissibility as the "immigration version of the death penalty," the IJ read Roper to suggest that juveniles should be spared the application of the admissibility bar because they lack "sufficient maturity to understand the scope and ramifications of any such claim or misconduct on their part."

---

[1]In later notices, the Service expanded the grounds of inadmissibility. It included a charge that Sandoval was an immigrant not in possession of a valid immigrant entry document and present in the United States without having been admitted or paroled and charges of fraud stemming from Sandoval's misrepresentations when obtaining and renewing the Minnesota ID and when testifying under oath during her adjustment of status interview in 2004. Because the IJ granted a hardship waiver for these later-added charges and the Service is not relying on them in this litigation, we will not address them on this appeal.

The government appealed, and the Board reversed the IJ's ruling in an unpublished decision by a single member. The entire reasoning of the Board was encapsulated in one sentence: "We find no legal authority or support for the Immigration Judge's 'bright line rule' and a conclusion that persons under the age of 18 categorically lack sufficient maturity and mental capacity to falsely claim United States citizenship." On remand, the Board instructed the IJ simply to determine "whether the facts of the case support a conclusion that the respondent is inadmissible as one falsely claiming United States citizenship."

The IJ followed the Board's edict. After registering his disagreement with the Board's legal reasoning, he made a factual finding that Sandoval attempted to pass herself off as her sister and did not retract her misrepresentation in time to avoid the penalties under section 212(a)(6)(C)(ii). The IJ did not address Sandoval's argument regarding the effect of her unaccompanied minor status on the rules of timely retraction, apparently considering the point preempted by the Board's previous decision. In the end, the IJ denied Sandoval's application for adjustment of status and found her removable, but granted her request for voluntary departure.

Presented with the case a second time, the Board upheld the IJ's factual findings. This time, not unlike the first, the single Board member disposed of Sandoval's renewed legal argument insisting on the special treatment of unaccompanied minors in but one sentence. It construed the argument as a request for reconsideration and denied it, finding "no error of fact or law in our [previous] decision." The present petition for review followed.

II

Some background is in order. Section 212(a)(6)(C)(ii) of the INA renders inadmissible "[a]ny alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this

-5-

chapter . . . or any other Federal or State law." 8 U.S.C. § 1182(a)(6)(C)(ii)(I). The provision was added to the INA by the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. 104-208, Div. C, Title II, § 344(a), 110 Stat. 3009-546 (1996), which Congress enacted in 1996 out of concern about proliferation of fraud in accessing various federal benefits restricted to United States citizens or certain eligible non-citizens. See H.R. Rep. No. 104-861, at 50 (1996); 142 Cong. Rec. S11,503-02 (daily ed. Sept. 27, 1996) (statement of Sen. Paul Coverdell). Section 212(a)(6)(C)(ii) dovetails to another part of the IIRIRA that established systems for verification of work authorization, Pub. L. 104-208, Div. C, Title IV, § 401-04, designed to prevent unauthorized employment and loss of jobs to non-citizens. See 142 Cong. Rec. S4,577-01 (daily ed. May 2, 1996) (statement of Sen. Simpson). In addition to the civil provision establishing inadmissibility of aliens who make false claims to citizenship, the IIRIRA punished the same conduct criminally. See Pub. L. 104-208, Div. C, Title II, § 215, codified at 18 U.S.C. § 1015(a).

Unlike other kinds of misrepresentations, this ground of inadmissibility is not waivable, and it triggers a permanent bar to the alien's admissibility into the country. Theodros v. Gonzales , 490 F.3d 396, 401 (5th Cir. 2007); Pichardo v. INS, 216 F.3d 1198, 1201 (9th Cir. 2000). The only exception to the bar exists for children whose parents are both United States citizens, who "permanently resided in the United States prior to attaining the age of 16," and who "reasonably believed at the time of such statement, claim, or violation that he or she was a citizen." 8 U.S.C. § 1101(f). Almost exclusively, this provision inures to the benefit of foreign-born children adopted by the United States citizens who did not realize they had to be naturalized. Hughes v. Ashcroft, 255 F.3d 752, 758-60 (9th Cir. 2001). Although Sandoval was once adopted by her sister's family, no one argues § 1101(f) applies to this case.

## A.

As straightforward as the statute may sound, it nevertheless presents an interesting wrinkle in the context of Sandoval's case. First before the agency and now before the court, Sandoval, who was sixteen at the time of the incident, argues the statute does not apply to unaccompanied minors like herself. She maintains minors consistently receive special treatment throughout the INA, and she cites several sections that indeed attach particular significance to an alien's status as a minor. See, e.g., 8 U.S.C. § 1182(a)(9)(B)(iii)(I) (providing that aliens under the age of eighteen do not accrue unlawful presence in the United States); 8 U.S.C. § 1445(b) (restricting the right to apply for naturalization to individuals over eighteen); 8 U.S.C. § 1183a(f)(1)(B) (requiring that a sponsor providing an affidavit of support on behalf of an alien be at least eighteen years of age). It is especially true, her argument proceeds, with regard to unaccompanied minors, who were the subject of the recently enacted William Wilberforce Trafficking Victims Protection Reauthorization Act, Pub. L. 110-457, 122 Stat. 5044 (2008). The Act created special procedures for handling unaccompanied minor children at the ports of entry, including the procedure for permitting them to withdraw their applications for admission and avoid removal proceedings. See 8 U.S.C. § 1232.

Recognizing the all-encompassing language of the statute – after all, section 212(a)(6)(C)(ii) applies to "[a]ny alien" who makes a false claim to citizenship – Sandoval advances a more nuanced argument that, even where a statute does not provide for a different treatment of minors on its face, the agency has stepped in to do so. See, e.g., 8 C.F.R. § 208.4(a)(5)(ii) (treating an applicant's status as a minor as an "extraordinary circumstance[]" excusing non-compliance with the one-year limitations period for applying for asylum, 8 U.S.C. § 1158(a)(2)(D)); 8 C.F.R. § 1240.10(c) (prohibiting an immigration judge from "accept[ing] an admission of removability from an unrepresented respondent who is . . . under the age of 18 and is not accompanied by an attorney or legal representative, a near relative, legal guardian, or

friend"). Sandoval attempts to bolster her argument by pointing to the Supreme Court cases emphasizing the peculiar immaturity and vulnerability of minors, see, e.g., Roper v. Simmons, 543 U.S. 551, 569-70 (2005); Bellotti v. Baird, 443 U.S. 622, 633-34 (1979). In light of these authorities, Sandoval contends, the only way to interpret section 212(a)(6)(C)(ii) to maintain a "symmetrical and coherent regulatory regime," FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000), would be to exclude unaccompanied minors from its operation.

The government disagrees. It argues the statute is clear on its face. According to the government, where Congress wanted to provide for a special treatment of minors – as in the sections cited by Sandoval – it has done so expressly. It has not done so here, the government's logic goes, so section 212(a)(6)(C)(ii) must be enforced as written. This approach, the government submits, would be consistent with other situations where the agency elected to treat minors on par with adults. See, e.g., Llapa-Sinchi v. Mukasey, 520 F.3d 897, 900 (8th Cir. 2008) (upholding service of the deportation hearing notice on a fourteen-year-old unaccompanied minor under 8 C.F.R. § 103.5a(c)(2)).

But even the government does not buy everything it is trying to sell. At oral argument, in contrast to the brief, the government conceded the statute would not apply to an eight-year-old child whose parents armed her with a fraudulent birth certificate and instructed her to say she was a United States citizen if asked by the officer. Having thereby departed from the black-and-white construction of the statute in favor of the case-by-case approach, the government nevertheless struggled to articulate why Sandoval fell on the wrong side of the divide.

The government's predicament is a classic side effect of having to devise an ex post facto rationalization for someone else's poorly-reasoned decision. The use of the phrase "any alien" in the statute does not definitively answer Sandoval's question for the agency or for this court. See Reves v. Ernst & Young, 494 U.S. 56, 60 (1990)

(refusing to interpret the term "any note" as literally *any* note and opting in favor of the interpretation that best comports with the purpose of the legislative enactment). The Board's decisions on the subject are of no help in articulating a coherent position. Despite two opportunities to develop the law in this area, the Board chose to avert the task both times. Confronted with the IJ's initial decision in favor of Sandoval, the Board relied on the absence of legal authority for the IJ's actions to send the case back. When the issue reached the Board for the second time, it likewise dodged the issue by characterizing it as a request for reconsideration and denying relief summarily.

The problem, of course, is that these pronouncements do not dedicate the agency to a clear position subject to meaningful judicial review. The Board's statement concerning the lack of authority for the IJ's initial position is susceptible of at least three interpretations: (a) that the statute applies indiscriminately to any alien, no matter what the age; (b) that the statute has to be interpreted on a case-to-case basis with an eye toward certain factors; or (c) that the statute applies, perhaps presumptively, to all individuals above certain age designated by the agency, but that age happens to be lower than eighteen. Nor do the Board's decisions address the significance of Sandoval's unaccompanied status at the port of entry.

Yet depending on the position the Board takes, the court's review would be animated by different concerns. In the first case, the court would wrestle with the implications of applying the "drastic measure" of a permanent admissibility bar to each child regardless of her capacity to comprehend the wrongfulness of her actions, Padilla v. Kentucky, 130 S.Ct. 1473, 1478 (2010) (internal quotation marks and citation omitted); the court would also need to reconcile its interpretation with other sections of the INA. In the middle scenario, we would focus on the factors that led the agency to conclude that the section is properly applied to Sandoval. Finally, the last approach would likely present us with the legal question of whether the agency's choice of the threshold age is reasonable. In either case, it goes without saying the

court would accord substantial deference to the Board's interpretation of section 212(a)(6)(C)(ii). See Lateef v. Dep't of Homeland Sec., 592 F.3d 926, 929 (8th Cir. 2010).

The dissent peppers its opinion with profuse citations to Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), urging the court to defer to the agency interpretation of the statute. While this court is prepared to give deference to the agency's reasonable interpretation of the statute, in this case such interpretation is simply missing. Judicial deference is by no means a substitute for the Board's duty to provide a reasoned, intelligible analysis for its decision. See Hagi-Salad v. Ashcroft, 359 F.3d 1044, 1049 (8th Cir. 2004); Guchshenkov v. Ashcroft, 366 F.3d 554, 560 (7th Cir. 2004). It is precisely out of respect for the agency role in the statutory scheme, which is "of special importance" in the immigration context, that we remand the case to the Board to "address the matter in the first instance in light of its own experience." Negusie v. Holder, 129 S.Ct. 1159, 1164 (2009) (citing INS v. Orlando Ventura, 537 U.S. 12, 16-17 (2002)) (internal quotation marks omitted).

In affording the agency the *third* opportunity to consider Sandoval's argument, we might be treading close to transforming judicial review into a "ping-pong game" of sorts. Alam v. Gonzales, 438 F.3d 184, 187 (2d Cir. 2006). We do so, however, because we believe "[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." SEC v. Chenery Corp., 332 U.S. at 196. Besides being essential for judicial review, the exact position of the Board on applying section 212(a)(6)(C)(ii) is important to many immigrants, given that over 100,000 unaccompanied minors cross unlawfully into the United States each year. See Lori A. Nessel, Families at Risk: How Errant Enforcement and Restrictionist Integration Policies Threaten the Immigrant Family in the European Union and the United States, 36 Hofstra L. Rev. 1271, 1291 (2008) (citing the figure of 122,000 minors for 2004). We trust the agency can address Sandoval's principal

argument on the merits, and we reserve our evaluation of this argument until such time.

B.

Sandoval's second argument deals with the effect of her status as an unaccompanied minor on the issue of timely retraction. "The doctrine of timely recantation is of long standing and ameliorates what would otherwise be an unduly harsh result for some individuals, who, despite a momentary lapse, simply have humanity's usual failings, but are being truthful for all practical purposes." Valadez-Munoz v. Holder, 623 F.3d 1304, 1309 (9th Cir. 2010). The rule "serves to excuse the misrepresentation by showing that the alien lacked the requisite intent to make a false statement." Olea-Reyes v. Gonzales, 177 F. App'x 697, 700 (9th Cir. 2006). Under the formulation of the doctrine in the U.S. Department of State Foreign Affairs Manual,

> A timely retraction will serve to purge a misrepresentation and remove it from further consideration as a ground for INA 211(a)(6)(C)(i) inadmissibility. Whether a retraction is timely depends on the circumstances of the particular case. In general, it should be made at the first opportunity.

U.S. Dep't of State Foreign Affairs Manual, Vol. 9, § 40.63, Note 4.6.

Seizing on the undeniable logical connection between the intent to make a false statement and the alien's age, Sandoval argues the IJ should have taken her maturity level into account when considering whether she timely retracted her misrepresentation. We again abstain from ruling on the merits of this argument to enable the agency to formulate its position first. If the appeal dealt with the IJ's factual findings only, we would have no trouble upholding such findings under the substantial-evidence standard, particularly in light of the testimony by agent Vega.

See Nadeem v. Holder, 599 F.3d 869, 872 (8th Cir. 2010).  But the argument advanced by Sandoval is legal in nature and has been entirely ignored by the Board. For the reasons listed above, we leave it for the Board to decide whether the analysis of recantation should be capacity-sensitive.

## III

We vacate the Board's order and remand the case to the agency for further proceedings.

RILEY, Chief Judge, dissenting.

The majority vacates the Board's order and remands this case for a third decision in this matter because the majority "cannot discern whether the Board rejected Sandoval's arguments on a wholesale basis" or "whether the Board's analysis was more nuanced" and based on certain factors particular to Sandoval's case.  Ante at 1-2.  Because INA § 212(a)(6)(C)(ii)(I), 8 U.S.C. § 1182(a)(6)(C)(ii)(I), unambiguously applies to Sandoval as "any alien" and substantial evidence supports the IJ's decision (upheld by the Board) that Sandoval did not timely retract her false claim to United States citizenship, I respectfully dissent.

## I.  Plain Meaning of § 212(a)(6)(C)(ii)(I)

Despite what the majority describes as "the all encompassing language of the statute—after all, section 212(a)(6)(C)(ii) applies to '[a]ny alien' who makes a false claim to citizenship," the majority entertains Sandoval's "more nuanced argument that" § 212(a)(6)(C)(ii)(I) means something other than what the statute plainly says.[2]

---

[2]Sandoval argues for a different interpretation, but admits "[t]he language of the statute suggests a strict-liability rule."

Ante at 7. The majority then remands the case to the Board "to articulate the reasons Sandoval deserves no relief." Ante at 2. In so doing, the majority abdicates the court's responsibility to give effect to the clearly expressed intent of Congress in § 212(a)(6)(C)(ii)(I) and ignores the government's congruent and consistent application of the statute to Sandoval.

Where, as here, "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). See also In re Operation of Mo. River Sys. Litig., 418 F.3d 915, 917-18 (8th Cir. 2005) ("Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete." (quoting Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1032 (8th Cir. 2003) (internal quotation marks omitted))).

The majority does not explain, and it is difficult to imagine, how Congress could more clearly state § 212(a)(6)(C)(ii)(I) applies to "any alien," including unaccompanied minors like Sandoval. See United States v. Jongewaard, 567 F.3d 336, 340 (8th Cir. 2009) (rejecting the possibility that Congress's use of the phrase "any threat" could plausibly be argued to be ambiguous or a nuanced "term of art"). Absent such an ambiguity, "[t]he plain meaning of [§ 212(a)(6)(C)(ii)(I)] controls," Horras v. Leavitt, 495 F.3d 894, 900 (8th Cir. 2007) (quoting Hennepin Cnty. Med. Ctr. v. Shalala, 81 F.3d 743, 748 (8th Cir. 1996) (internal quotation marks omitted)). We need not "wrestle with the implications of applying the 'drastic measure' of a permanent admissibility bar to each child regardless of her capacity to comprehend the wrongfulness of her actions," ante at 9, because Congress resolved that issue when it enacted § 212(a)(6)(C)(ii)(I).

As the majority notes, there is one limited statutory exception that does not apply here. Ante at 6. See 8 U.S.C. § 1182(a)(6)(C)(ii)(II). The fact Congress

-13-

provided only one exception strongly supports the conclusion that the plain language of "any alien" is purposeful and has no other exceptions. See United States v. Johnson, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.").

The majority's reliance on Reves v. Ernst & Young, 494 U.S. 56 (1990), as support for ignoring the plain meaning of "any alien," see ante at 9, is misplaced. In Reves, the Supreme Court declined automatically to treat all notes as securities within the meaning of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., because the purpose of the act was to regulate investments and the term "note" had a "relatively broad" meaning, "encompass[ing] instruments with widely varying characteristics, depending on whether issued in a consumer context, as commercial paper, or in some other investment context." Reves, 494 U.S. at 62 (internal quotation marks omitted). No such uncertainty exists here. The INA speaks directly to false claims to U.S. citizenship like Sandoval's, unambiguously defines alien as "any person not a citizen or national of the United States," see 8 U.S.C. § 1101(a)(3), and delineates only one class of aliens not covered by the statute. Sandoval is "obviously within the class Congress intended to regulate." Reves, 494 U.S. at 62.

To the extent the majority maintains Congress has not "directly spoken" to this specific issue and circumstances, the government has clearly articulated its reasonable interpretation that § 212(a)(6)(C)(ii)(I) unambiguously refers to "any alien," including unaccompanied minors like Sandoval. See Chevron, 467 U.S. at 843 (explaining, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute").

The majority contends the Board's decisions "are of no help in articulating a coherent position" and the Board "dodged the issue" in this petition. Ante at 9. The majority also attempts to expand the government's inartful oral argument into an abandonment of "the black-and-white construction of the statute in favor of a case-by-case approach."[3] Ante at 8. The majority's recitation and reasoning are not only unwarranted given the plain meaning of § 212(a)(6)(C)(ii)(I), they are wrong.

In affirming the IJ's decision that Sandoval was statutorily ineligible for adjustment of status, the Board unequivocally stated "[§ 212(a)(6)(C)(ii)] neither describes nor is limited to certain classes of aliens. Rather, it is unlimited as it applies to 'any' alien." In its brief, the government, citing Chevron, likewise asserts the "plain language" of § 212(a)(6)(C)(ii)(I) "applies to any and all aliens and creates no specific exceptions or waivers for unaccompanied minors." The government then explained, "If Congress wanted to create an exception under the false claim provision for unaccompanied minors, [Congress] could have easily done so and the absence of such an exception speaks directly to the intent of Congress." Neither the Board nor the government dodged the issue, and each took a uniform and coherent position following the plain language of the law.

Although the government admittedly "misstated the deference owed to the [Board's] decision" at oral argument, the government's subsequent Fed. R. App. P. 28(j) letter reiterated "[b]oth the agency and this Court must give effect to the plain

---

[3]I suspect the government's purported failure to "buy everything it is trying to sell" is not so much a "classic side effect of having to devise an ex post facto rationalization for someone else's poorly-reasoned decision," ante at 8-9, as it is a product of the potential conflict between the government's responsibility to enforce the statute as drafted to uphold the Board's decision and its interest in maintaining flexibility in interpreting immigration law in the future. Regardless, we "must reject administrative constructions which are contrary to clear congressional intent." Chevron, 467 U.S. at 843 n.9.

language of the statute." I agree. It is the law. It is our judicial duty. See Chevron, 467 U.S. at 842-43.

## II.  Timely Retraction

Although the majority concedes it "would have no trouble upholding [the IJ's findings that Sandoval did not timely retract her false statements] under the substantial-evidence standard," the majority "again abstain[s] from ruling on the merits of this argument" and "leave[s] it for the Board to decide whether the analysis of recantation should be capacity-sensitive." Ante at 12. This is unwarranted and a waste of time.

The IJ, who was overtly sympathetic to Sandoval's status as an unaccompanied minor, considered at length Sandoval's age, intelligence and ability to understand her actions before deciding Sandoval "was aware that she was making a false claim to U.S. citizenship," "had an understanding of what she was doing when she entered the United States," and did not make a timely retraction. In reaching its decision, the IJ reluctantly followed the law, the facts and precedent, stating,

> Since I am not allowed to apply a bright-line rule in [regard to the IJ's original decision "that a minor should not be held responsible for such actions"], I do have to look to the individual respondent here and I believe that she had knowledge of what she was doing at the time.
>
> I do not believe that we are dealing with a timely retraction here, as pursuant to the Board's decision in Matter of M–, 9 I&N Dec. 118 (BIA 1960).

We must do the same: follow the law, facts and precedent. Even under Sandoval's capacity-sensitive approach to timely retraction, her petition for review should be denied.

_____