PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3234
_____

JOSE GERARDO CASTRO,
*Petitioner*

v.

ATTORNEY GENERAL OF THE UNITED STATES,
*Respondent*
_____

On Petition for Review from an Order
of the Board of Immigration Appeals
(Agency No. A090 661 163)
Immigration Judge: Hon. Frederic Leeds
_____

Argued on October 24, 2011

Before: SLOVITER and GREENAWAY, JR., *Circuit Judges*,
and POLLAK, *District Judge*[*]

_____

[*] Honorable Louis H. Pollak, Senior Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

(Opinion Filed: February 14, 2012)

Joseph C. Sekula (Argued)
Sekula & Sekula, LLC
922 Main Street, Suite 202
Paterson, NJ 07503
        *Counsel for Petitioner*

Tony West, Assistant Attorney General, Civil Division
Greg D. Mack, Senior Litigation Counsel
W. Daniel Shieh, Attorney
Lisa M. Damiano, Attorney (Argued)
Office of Immigration Litigation
United States Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
        *Counsel for Respondent*

_____

OPINION OF THE COURT
_____


POLLAK, *District Judge*.

Jose Castro, a citizen of Costa Rica, challenges a determination by the Board of Immigration Appeals ("BIA") that he is inadmissible under section 212(a)(6)(C)(ii) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(6)(C)(ii), which provides that "[a]ny alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or

benefit under this chapter (including section 1324a of this title) or any other Federal or State law is inadmissible." We conclude that the statute does not apply to Castro's conduct, and we therefore reverse and remand to the BIA.

## I. Administrative Proceedings

Castro has lived in the United States since entering the country on a visitor's visa in 1980, when he was twenty years old. In 1989, he married Alma Rangel, who became a U.S. citizen by naturalization in 1997. Castro and Rangel have one child, born in New Jersey in 1990.

## A. Adjustment of Status Application

In 2006, Castro filed an application to adjust his status to permanent residence based on his marriage to Rangel. During his interview with the Department of Homeland Security ("DHS") on his adjustment application, Castro disclosed that he had been arrested in 2004. At DHS's request, Castro provided DHS with a copy of the arrest report for this incident from the Paterson, New Jersey, police department. The arrest report showed that Castro was arrested on September 25, 2004, on a charge of violating N.J. Stat. Ann. § 2C:34-1.1(b).[1] The arrest report listed Castro's

---

[1] Under N.J. Stat. Ann. § 2C:34-1.1(b), "[a] person commits a disorderly persons offense if he: (1) wanders, remains or prowls in a public place with the purpose of engaging in prostitution or promoting prostitution . . . and (2) engages in conduct that, under the circumstances, manifests a purpose to engage in prostitution or promoting prostitution . . . ." According to the brief narrative contained in the arrest report, Castro was arrested for "propositioning an undercover police

place of birth as "Puerto Rico." Castro also provided DHS with documentation showing that he had resolved the charge against him by pleading guilty to a disorderly conduct municipal offense.

DHS concluded, based on the arrest report, that Castro had falsely claimed to be from Puerto Rico rather than Costa Rica at the time of his arrest. In the agency's view, this triggered the bar to admissibility contained in 8 U.S.C. § 1182(a)(6)(C)(ii). On the basis of its inadmissibility determination, DHS concluded that Castro was ineligible for adjustment of status to permanent residence.[2] DHS notified Castro on September 5, 2006, that his application for adjustment of status had been denied and that he could be subject to removal proceedings if he failed to depart from the country voluntarily.

**B. Immigration Court Proceedings**

On February 28, 2007, DHS initiated removal proceedings against Castro on the basis of 8 U.S.C.

---

officer . . . for sexual activity in exchange for something of an economical value, to wit: $10.00 [for] oral sex."

[2] An applicant for adjustment of status is "assimilated" to the position of an individual seeking entry as an immigrant from outside the United States. *See, e.g.*, *Jankowski-Burczyk v. INS*, 291 F.3d 172, 175 n.2 (2d Cir. 2002); *Matter of Rainford*, 20 I. & N. Dec. 598, 601 (BIA 1992). Thus, Castro could not be eligible for adjustment of status unless he was admissible to the country at the time of his application.

4

§ 1182(a)(6)(C)(ii).[3]  DHS later added a charge that Castro was removable because he had overstayed his visa.  8 U.S.C. § 1227(a)(1)(B).  Castro conceded that he was removable for having overstayed his visa, but he denied that § 1182(a)(6)(C)(ii) applied to him.

In the Immigration Court, Castro pursued two forms of relief from removal: first, he renewed his previously filed application for adjustment of status to permanent residence; second, he applied for cancellation of removal under INA § 240A(b), 8 U.S.C. § 1229b(b).[4]  The Immigration Judge

---

[3] DHS notified Castro that he was "subject to removal" pursuant to 8 U.S.C. § 1182(a)(6)(C)(ii).  That citation appears to be a mistake: § 1182(a)(6)(C)(ii) makes an alien inadmissible, but not removable.  A separate provision, 8 U.S.C. § 1227(a)(3)(D)(i), mirrors the language of § 1182(a)(6)(C)(ii) and makes a false claim of citizenship "for any purpose or benefit under this chapter (including section 1324a of this title) or any Federal or State law" an independent ground for removal, but DHS did not invoke that provision in Castro's case.

[4] 8 U.S.C. § 1229b(b)(1) provides:

> The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien—
>
> > (A)    has been physically present in the United States for a continuous

("IJ") held a hearing on Castro's case on March 4, 2008. At the outset of the hearing, Castro's counsel observed that he had not yet received the entire administrative record from DHS. That prompted the IJ to ask Castro's counsel whether counsel would like time to review the entire administrative file. Castro's counsel declined, stating, "I don't think there's anything else relevant regarding the adjustment in the administrative package."

Two witnesses testified at the hearing: Castro and Detective William Palomino, the Paterson police officer who arrested Castro and filled out the arrest report. They gave contrasting accounts of Castro's statements after the arrest.

---

period of not less than 10 years immediately preceding the date of such application;

(B) has been a person of good moral character during such period;

(C) has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) of this title, subject to paragraph (5); and

(D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

6

Palomino testified that Castro provided him with the information about Castro's place of birth that Palomino entered on the arrest report. He further testified that he spoke Spanish and that there was no chance that he could have misunderstood "Costa Rica" as "Puerto Rico." On cross-examination, Castro's counsel asked Palomino a series of questions about the arrest report:

> Q. Okay, so basically your only recall of this [arrest], and it's admittedly over three years ago, is from your police arrest report?
>
> A. Correct.
>
> . . . .
>
> Q. Looking at your arrest report again, there's several things that are not filled in. Why did you not fill in his social security number?
>
> A. He, he didn't give me one.
>
> . . . .
>
> Q. And, if he didn't give you a social security number wouldn't that lead you to believe that he may not be a United States citizen?
>
> A. He didn't know his, not necessarily. He didn't know his, he didn't know his social security number. A lot of people

don't know their social security number at the time when we arrest them.

. . . .

Q.  Do you see that box where it says U.S. citizen, yes or no, officer?

A.  Yes, I do.

Q.  And, how come there's nothing checked there?

A.  I don't know, sir.

In addition to the arrest report, DHS submitted to the IJ a second document relating to the same incident, entitled "jail arrest card." On the jail arrest card, the question "U.S. Citizen?" had been marked "Y." Castro's counsel also questioned Palomino about the jail arrest card:

Q.  [D]o you know who fills out the [jail] arrest card?

A.  No, sir.

Q.  Okay.

A.  Whoever the officer is [who] is assigned to cellblock, he usually fills it out, but I don't know.

Palomino also testified about the procedure by which he handled Castro's case:

8

Q.      Okay, would Mr. Castro saying he was a United States citizen or citizen of Costa Rica [have] made any difference regarding your procedure in handling this matter?

A.      No, sir.

Q.      So there was no benefit gain[ed] by Mr. Castro saying he was from Puerto Rico?

. . . .

A.      No, there's no gain.

. . . .

Q.      Okay, and would you treat him any differently if he was incarcerated as a person from Puerto Rico or Costa Rica?

A.      No, sir.

. . . .

Q.      In your practice and procedure in how you arrest people and how you act, would it make a difference where a person is from to what your job is?

A.      No, sir.

Q.      Okay, so you would have arrested him regardless of his country and you would

have detained him and sent him to jail regardless of his country of birth?

A.      Yes, sir.

After the conclusion of Palomino's testimony, Castro took the stand. Castro testified that he told Palomino that he was born in "Costa Rica." He explained that, at the time of his arrest, "we were two people in the car and the other guy was Puerto Rican." As to the jail arrest card, Castro stated that he volunteered his driver's license at the jail but that he did not provide any additional personal information.

Castro also testified that he first saw the arrest report on "the second day after I was arrested" and that he returned to the police station to tell an officer that "the report was incorrect." When the IJ asked Castro why he went back to the police, Castro answered "because my wife read [the arrest report] and told me that it was incorrect." Castro explained that he was about to submit his application for adjustment of status to permanent residence and that he was concerned that "what was being said in the report was erroneous." Castro testified that when the police officer told him that the error as to his place of birth "was not a problem," Castro explained to the officer that "yes that was a problem because automatically they will send me back to my country and I'd been here in this country many years."

At the conclusion of the March 4, 2008, hearing, the IJ issued an oral opinion accompanied by a written summary. The IJ credited Palomino's testimony that Castro gave his place of birth as Puerto Rico. From this, the IJ inferred that Castro had made a false claim to U.S. citizenship.

10

The IJ further concluded that Castro had falsely claimed to be a U.S. citizen for a "purpose or benefit under . . . Federal or State law," within the meaning of 8 U.S.C. § 1182(a)(6)(C)(ii). He explained his reasoning as follows:

> This is the more difficult issue. Counsel claims there is some kind of case law. There has been no brief by respondent's counsel. There has been no specific Board case, other Circuit case, or 3rd Circuit case proffered here today. And, we have as a factual matter, respondent's own testimony here today that he knew the potential consequences because he was going to be applying for legal status in the United States.

> Now, I want to make it clear here the respondent indicated that, has already acknowledge[d] that he has no legal status. So, it is clear to this Court that there is a direct benefit here for someone because if you have a crime, you may face some sort of legal consequences. Counsel pointed out that this may alone not have been enough, but it goes to the issue of discretion and he chose, respondent chose not to be candid with his country of designation as the Court understood his testimony here today.

> Respondent further testified that his wife had a naturalization application pending and that this would have, may have had a deleterious impact on that for him as well. So there you have a series of benefits. You have

the benefit of someone who had no legal status and having an arrest come up. You had someone who was in the process of filing for an adjustment of status, its impact therein is a matter of discretion and you have the wife seeking naturalization and the impact this would have on the naturalization process which respondent readily acknowledged.

. . . .

Therefore, I unfortunately find that the respondent did make a false claim to citizenship in an effort to obtain a benefit. In this instance to stay in the United States.

Because the IJ found Castro to be inadmissible under 8 U.S.C. § 1182(a)(6)(C)(ii), he denied Castro's application for adjustment of status. Without stating his reasons for doing so, the IJ also denied Castro's application for cancellation of removal. Having thus denied both of Castro's applications for relief from removal, the IJ ordered that Castro be removed to Costa Rica.

## C. Proceedings before the BIA

### 1. Appeal of the Merits

Castro's counsel filed a notice of appeal with the BIA on April 4, 2008. In the notice, the stated ground of appeal was that the IJ "improperly interpreted the law in finding that [Castro] made a false claim to U.S. citizenship in order to receive a legal benefit."

Attached to the notice of appeal was a copy of a letter dated September 27, 2006, addressed to "The Attorney of Jose Castro" from Sergeant Thomas Trommelen of the Paterson police department. In the letter, Trommelen stated, "I spoke with Det. Palomino who said it was possible Castro could have said Costa Rico [sic] as apposed [sic] to Puerto Rico when he asked him for his place of birth that night." The notice of appeal made no reference to the attached letter, and no separate written brief was filed on Castro's behalf with the BIA in support of the notice of appeal.

On January 21, 2010, a three-judge panel of the BIA, one member dissenting, issued a decision affirming the IJ's denial of Castro's application for adjustment of status. The BIA unanimously found no clear error in the IJ's determination that Castro told Palomino that he was born in Puerto Rico. The Board acknowledged receipt of Trommelen's letter but declined to consider it because Castro "ha[d] not demonstrated that the letter, dated September 27, 2006, was not available and could not have been discovered or presented in the 2008 hearing before the Immigration Judge."

A majority of the BIA panel also upheld the IJ's determination that Castro's statement that he had been born in Puerto Rico satisfied 8 U.S.C. § 1182(a)(6)(C)(ii). The majority reasoned that Castro had made a false claim to U.S. citizenship for a "purpose or benefit under . . . Federal or State law," within the meaning of § 1182(a)(6)(C)(ii), because "*inter alia*, the respondent had no status in this country, and evidently feared being turned over to the Department of Homeland Security." BIA Member Patricia A. Cole dissented on this point, stating, "I do not find the section

212(a)(6)(C)(ii) of the Act charge to be sustained because the record does not establish that the respondent met the 'purpose or benefit' requirement for this charge."

Having upheld the IJ's inadmissibility determination, the BIA dismissed Castro's appeal, thereby sustaining the IJ's order that Castro be removed to Costa Rica. The BIA did not address the IJ's denial of Castro's application for cancellation of removal under 8 U.S.C. § 1229b(b).[5]

### 2. Motion to Reconsider

On February 22, 2010, Castro filed a motion to reconsider the BIA's decision, arguing that the BIA erred in adopting the IJ's application of 8 U.S.C. § 1182(a)(6)(C)(ii). Castro maintained that he did not say that he was from Puerto Rico and, alternatively, that giving his place of birth as Puerto Rico would not satisfy § 1182(a)(6)(C)(ii) under the circumstances. Additionally, Castro argued that the failure of DHS to provide him with a copy of Trommelen's letter violated due process.

On June 28, 2010, the BIA denied Castro's motion to reconsider its prior decision, concluding that Castro had not shown "any error of fact or law in that decision that would alter the outcome." Castro then filed the present petition for review of the BIA's denial of his motion to reconsider.

---

[5] It would appear that inadmissibility under 8 U.S.C. § 1182(a)(6)(C)(ii) does not result in ineligibility for cancellation of removal. *Matter of Guadarrama de Contreras*, 24 I. & N. Dec. 625, 627 (BIA 2008). However, Castro has not challenged the BIA's silence on the cancellation-of-removal issue.

14

## II. Jurisdiction and Standard of Review

### A. Petition for Review of Denial of Reconsideration

The scope of our jurisdiction is contested by the parties. We review questions of our own jurisdiction *de novo*. *Higgs v. Att'y Gen.*, 655 F.3d 333, 337 (3d Cir. 2011).

Castro filed a timely petition for review of the BIA's June 28, 2010, order denying his motion to reconsider. He did not file a petition for review of the BIA's January 21, 2010, decision on the merits of his administrative appeal.

An adverse BIA decision on the merits (and accompanying order of removal) and a BIA order denying a motion to reconsider are "two separate final orders." *Stone v. INS*, 514 U.S. 386, 405 (1995). Either one may be the subject of a petition for judicial review, which must be filed within thirty days of the date of the order. 8 U.S.C. § 1252(a)(1), (b)(1). As the government points out, filing a motion to reconsider does not toll the thirty-day period for seeking review of the earlier merits decision. *Stone*, 514 U.S. at 398-99; *see also Khalil v. Att'y Gen.*, 309 F. App'x 624, 627 (3d Cir.), *cert. denied*, 130 S. Ct. 188 (2009). When judicial review is sought of both a BIA decision on the merits and a BIA decision on reconsideration, the two petitions for review must be consolidated and considered together. 8 U.S.C. § 1252(b)(6). But nothing prevents a petitioner from seeking review of only one of the two BIA orders. *See, e.g., Nocon v. INS*, 789 F.2d 1028, 1033 (3d Cir. 1986) (only reviewing denial of motion to reconsider).

The government contends that Castro's decision to seek review of the BIA's reconsideration decision, but not the

15

BIA's earlier merits decision, curtails our jurisdiction to consider "the merits of his arguments against inadmissibility and removability." In the government's view, these arguments are, in effect, an untimely appeal of the BIA's earlier decision. We disagree. Some review of the merits decision is required in order to determine whether the BIA erred in concluding, on reconsideration, that Castro had not shown any error of fact or law in that decision that would alter the outcome.

The BIA has described a motion for reconsideration as a "request that the Board reexamine its decision in light of additional legal arguments, a change of law, or perhaps an argument or aspect of the case which was overlooked." *Matter of Ramos*, 23 I. & N. Dec. 336, 338 (BIA 2002); *see also* 8 C.F.R. § 1003.2(b)(1). Thus, "[b]y its very nature, a motion for reconsideration alleges defects of some sort in the underlying decision by the BIA," such that judicial review of the denial of a motion for reconsideration "ordinarily requires some review of the underlying decision." *Esenwah v. Ashcroft*, 378 F.3d 763, 765 (8th Cir. 2004); *see also Narine v. Holder*, 559 F.3d 246, 248-49 (4th Cir. 2009) (reviewing issues addressed in BIA's merits decision on petition for review of BIA's denial of motion to reconsider).

We review a BIA denial of a motion to reconsider for abuse of discretion. *Pllumi v. Att'y Gen.*, 642 F.3d 155, 158 (3d Cir. 2011). As a consequence, a petitioner who only seeks review of a BIA order on reconsideration forgoes any more favorable standard of review that might have applied had the petitioner sought review of the BIA's underlying decision on the merits. *Esenwah*, 378 F.3d at 765. Nevertheless, without some appraisal of the underlying

merits, it would not be possible for an appellate court to evaluate whether the BIA abused its discretion in denying a motion to reconsider the merits.

The BIA abuses its discretion when it acts in a manner that is "arbitrary, irrational, or contrary to the law." *Guo v. Ashcroft*, 386 F.3d 556, 562 (3d Cir. 2004). Questions of law are reviewed *de novo*, subject to any applicable administrative law canons of deference. *Fadiga v. Att'y Gen.*, 488 F.3d 142, 153-54 (3d Cir. 2007) (citing *Borges v. Gonzales*, 402 F.3d 398, 404 (3d Cir. 2005)).

## B. Exhaustion

The government also argues that Castro's failure to exhaust some of his claims presents a jurisdictional barrier to our review. We may review a final order of the BIA "only if . . . the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). The exhaustion requirement attaches to each particular issue raised by the petitioner. *Lin v. Att'y Gen.*, 543 F.3d 114, 120 & n.6 (3d Cir. 2008). A petitioner's failure to exhaust an issue by presenting it to the BIA deprives us of jurisdiction to consider that issue. *Id.* at 120-21; *Hua Wu v. Att'y Gen.*, 571 F.3d 314, 317 (3d Cir. 2009).

We agree that exhaustion presents a barrier to reviewing one issue that Castro raises for the first time in his briefing to this court: namely, that the arrest report and jail arrest card generated after his arrest should not have been admitted in his removal proceedings because the loitering law under which he was arrested was unconstitutional. Castro never presented that issue to the IJ or to the BIA. It is unexhausted, and we lack jurisdiction to consider it.

17

Castro duly exhausted his administrative remedies for the other two issues for which he now seeks judicial review. He challenged the applicability of 8 U.S.C. § 1182(a)(6)(C)(ii) throughout the administrative proceedings. As to his due process argument, described below, Castro attached Trommelen's letter to his notice of appeal, and his motion to reconsider framed DHS's alleged failure to disclose Trommelen's letter as a due process violation. That was sufficient to "place the Board on notice" of the issue, which is all that is required for exhaustion. *Lin*, 543 F.3d at 121 (quoting *Joseph v. Att'y Gen.*, 465 F.3d 123, 126 (3d Cir. 2006)).

### III. Discussion

### A. Due Process

In the removal context, due process requires that "an alien be provided with a full and fair hearing and a reasonable opportunity to present evidence." *Romanishyn v. Att'y Gen.*, 455 F.3d 175, 185 (3d Cir. 2006).

Castro claims that this due process requirement was violated because DHS failed to produce Sergeant Trommelen's letter. In the letter, Trommelen stated that Palomino, the officer who arrested Castro, told Trommelen that "it was possible Castro could have said Costa Rico [sic] as apposed [sic] to Puerto Rico" when Palomino was filling out the arrest report generated after Castro's 2004 prostitution arrest. The impeachment value of the letter is obvious: Palomino testified at the hearing in Castro's removal proceedings that it was not possible that he (Palomino) could have mistakenly heard "Puerto Rico" instead of "Costa Rica."

But there was no lack of due process in this case. The record shows that Castro had an opportunity to present the letter in the proceedings before the IJ. The letter is dated September 27, 2006—five months prior to the initiation, on February 28, 2007, of Castro's removal proceedings—and is addressed to Castro's counsel. Moreover, DHS made its file on Castro, which Castro alleges contained Trommelen's letter, available for review at the outset of the hearing on March 4, 2008. Castro's counsel declined to review the file. It is apparent that if Castro was unaware of Trommelen's letter at the time of his hearing, that was the fault of Castro's counsel, not of DHS.

## B. Application of 8 U.S.C. § 1182(a)(6)(C)(ii)

We turn finally to the application of 8 U.S.C. § 1182(a)(6)(C)(ii). The BIA sustained the IJ's determination that § 1182(a)(6)(C)(ii) rendered Castro inadmissible and thus ineligible for adjustment of status to permanent residence, with the result that he was ordered removed to Costa Rica. Section 1182(a)(6)(C)(ii) provides in pertinent part that:

> Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law is inadmissible.

Section 1182 provides for a waiver by the Attorney General of inadmissibility based on other forms of misrepresentation, *see* 8 U.S.C. § 1182 (i)(1); by implication, the bar to admissibility in § 1182(a)(6)(C)(ii) cannot be waived by the

19

Attorney General. *Pichardo v. INS*, 216 F.3d 1198, 1201 & n.5 (9th Cir. 2000).

To avoid this unwaivable bar, Castro challenges the BIA's factual determination that he stated that he was born in Puerto Rico and, in the alternative, the BIA's legal conclusion that falsely giving his place of birth as Puerto Rico would satisfy the statute under the circumstances.

### 1. Factual Challenge

Castro maintains that he told Palomino that he was born in Costa Rica rather than Puerto Rico, and that the IJ improperly credited Palomino's testimony in reaching the opposite conclusion.

The record, described in detail above, was mixed. Castro testified that he told Palomino that he was born in Costa Rica and that he tried to correct the arrest report after his wife noticed that the report said he was born in Puerto Rico. Palomino testified that Castro said "Puerto Rico," as recorded on the arrest report. But Palomino also testified that he had no recollection of Castro's arrest independent of the arrest report, and Castro offered, as a possible explanation for Palomino's alleged mistake, the fact that the other man who was in the car with him when he was arrested was Puerto Rican. Moreover, the portion of the arrest report which asked whether the arrestee was a U.S. citizen was left blank. The record also contains a jail arrest card, which was marked "Y" for "U.S. Citizen?" However, there was no testimony identifying the source of that information; Castro testified that he provided no personal information to the jail except his driver's license.

The burden was on Castro to prove that he was admissible for permanent residence. *See* 8 U.S.C. §§ 1229a(c)(2), 1255(a)(2). A reasonable trier-of-fact could have concluded that Palomino's testimony that Castro gave his place of birth as Puerto Rico, combined with the documentary evidence, was at least as credible as Castro's testimony. The BIA did not abuse its discretion in denying Castro's motion to reconsider on this ground.

The credibility dispute between Palomino and Castro went to the question of whether Castro said that he was born in Puerto Rico. Both the IJ and the BIA adopted the further inference that claiming to be born in Puerto Rico was tantamount to claiming to be a U.S. citizen. Because persons who were born in Puerto Rico are, by and large, U.S. citizens, this inference was not improper. *See* 8 U.S.C. § 1402.

The BIA did not abuse its discretion when it denied Castro's motion to reconsider the issue of whether Castro in fact claimed to be a citizen of the United States.

### 2. Legal Challenge

Section 1182(a)(6)(C)(ii) does not render inadmissible every alien who makes a false claim to United States citizenship. Rather, the false claim must be made "for any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law." Castro argues that even if he told the Paterson police that he was born in Puerto Rico—a premise Castro contests but we have accepted—he did not do so for a "purpose or benefit" under a law within the meaning of the statute.

The BIA, one panel member dissenting, held that the "purpose or benefit" requirement of 8 U.S.C. § 1182(a)(6)(C)(ii) was met in Castro's case because "*inter alia*, [he] had no status in this country, and evidently feared being turned over to the Department of Homeland Security." The BIA did not explain which other purposes or benefits were intended by "*inter alia*." We assume this to be a reference to the reasoning of the IJ, and thus we turn to the IJ's oral opinion.[6] That opinion, which we have already quoted at some length, referred to a "series of benefits":

> You have the benefit of someone who had no legal status and having an arrest come up. You had someone who was in the process of filing for an adjustment of status, its impact therein is a matter of discretion and you have the wife seeking naturalization and the impact this would have on the naturalization process which respondent readily acknowledged.

Castro's wife was not, in fact, seeking naturalization at the time; Castro was arrested in 2004, and the record shows that his wife became a naturalized citizen in 1997.

Setting that error aside, we understand the BIA and the IJ to have concluded that Castro's purpose in falsely stating that he was from Puerto Rico was to avoid the possibility that the Paterson police might report his arrest to DHS. This

---

[6] When the BIA issues an opinion additional to the IJ's opinion, we review the BIA's decision and look to the IJ's opinion "only insofar as the BIA defers to it." *Huang v. Att'y Gen.*, 620 F.3d 372, 379 (3d Cir. 2010).

22

would have been to Castro's benefit, according to the IJ, both because he was present in the country without legal status (and thus, the IJ presumed, wished to avoid any attention from DHS) and because he planned to apply for adjustment of status in the near future.[7]

There is scant record support for imputing this purpose to Castro. Palomino testified that Castro gave his place of birth as Puerto Rico, but the officer did not speak to Castro's purpose in doing so and specifically denied that Castro received any benefit by doing so. Castro's citizenship was

---

[7] Why the IJ thought that Castro would misrepresent his citizenship in order to benefit his future adjustment-of-status application is unclear. As demonstrated by this case, a false claim of citizenship is problematic for an alien who plans to file an adjustment-of-status application. In context, the IJ appears to have meant that Castro misrepresented his citizenship in an effort to ensure that DHS never learned of the arrest (though Castro gave his real name and other personal information to the police). Ultimately, it was Castro who brought himself to the attention of DHS by applying for adjustment of status, and Castro who disclosed his arrest to DHS.

The government also stresses that Castro had particular reason to avoid alerting DHS to an arrest for a *prostitution* offense. An alien who procures or attempts to procure a prostitute may be inadmissible on that ground alone. 8 U.S.C. § 1182(a)(2)(D)(ii). But that bar was not invoked in Castro's case and would have applied—if at all—regardless of whether Castro was forthright with the Paterson police about his place of birth.

23

simply immaterial to the Paterson police. There was no evidence that the Paterson police would have alerted DHS of Castro's arrest had he given his place of birth as Costa Rica, and no evidence (other than what can be inferred from the false statement itself) that Castro thought the police would do so. Castro testified that he intended to file an application for adjustment of status, but he offered this future application as a reason that he would *not* have given his place of birth as Puerto Rico. At bottom, the BIA's conclusion that Castro made a false claim of U.S. citizenship for the purpose of evading detection by immigration authorities seems to have been built solely on the assumption that this was a reasonable purpose to ascribe to Castro because he was undocumented.

The purpose imputed by the BIA to Castro would apply to virtually any false claim of citizenship made by an individual unlawfully present in the country, since the absence of legal status always provides a reason to wish to avoid the attention of DHS. That construction threatens to read the limiting language—the requirement that the "purpose or benefit" be "under this chapter (including section 1324a of this title) or any other Federal or State law"—out of the statute entirely. *See* 8 U.S.C. § 1182(a)(6)(C)(ii).

The government argues that the BIA has found that 8 U.S.C. § 1182(a)(6)(C)(ii) "is broadly defined," and that this construction is owed deference under either *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984), or *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). "[B]roadly defined" is a phrase that the government quotes from *Matter of Barcenas-Barrera*, 25 I. & N. Dec. 40, 42 (BIA 2009), *aff'd sub nom. Barcenas-Barrera v. Holder*, 394 F. App'x 100 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 1052 (2011). In

24

that case, the respondent falsely represented herself to have been born in Texas on her application for a U.S. passport, and she had already been criminally convicted of willfully and knowingly making the false statement on her passport application. *Id.* In finding that a willful and knowing false claim of citizenship on a passport application satisfied § 1182(a)(6)(C)(ii), the BIA did not purport to offer a comprehensive interpretation of the "purpose or benefit" language of the statute. The government points us to no other BIA interpretation of the relevant statutory language to which a court might be said to owe deference, and we are aware of none.

The language of the statute is not amenable to the expansive reading the government urges upon us. Section 1182(a)(6)(C)(ii) applies by its terms only when the alien makes a false claim of U.S. citizenship for "any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law." The legislative history suggests that Congress intended the bar to apply to false citizenship claims made in conjunction with applications for private employment—the subject of the cross-referenced provision, 8 U.S.C. § 1324a, *see infra* note 9—as well as for public services and benefits. The section was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, tit. II, § 344(a), 110 Stat. 3009-546, 3009-637. A chief purpose of the IIRIRA was "to improve deterrence of illegal immigration into the United States . . . by improving the verification system for the eligibility for employment." H.R. Rep. No. 104-828, at 199 (1996) (Conf. Rep.). The bill was also intended to address what its supporters perceived as "noncitizens' abuse of the welfare system" through fraudulent

applications for public benefits. 142 Cong. Rec. 24,783 (1996) (statement of Rep. Lamar Smith).[8] The author of the amendment that became § 1182(a)(6)(C)(ii), Senator Alan Simpson, stated that the provision was intended as a "disincentive for falsely claiming citizenship" during the employment verification process. 142 Cong. Rec. 10,030 (1996).

The case law surrounding 8 U.S.C. § 1182(a)(6)(C)(ii) reflects those concerns. As *Matter of Barcenas-Barrera* demonstrates, the provision has been applied when aliens make false claims of U.S. citizenship in applications for U.S. passports. *See also Muratoski v. Holder*, 622 F.3d 824, 827-29 (7th Cir. 2010); *Rodriguez v. Gonzales*, 451 F.3d 60, 65 (2d Cir. 2006). A false claim of U.S. citizenship made to obtain a U.S. passport is a false claim made for a "benefit under . . . Federal . . . law," within the meaning of § 1182(a)(6)(C)(ii), because a passport is itself a legal benefit that facilitates its holder's entry into the United States. *Matter of Barcenas-Barrera*, 25 I. & N. Dec. at 44. Similarly, the provision has been invoked in cases involving false claims of U.S. citizenship made orally or in writing to immigration officials for the purpose of gaining entry or

---

[8] *See also Sandoval v. Holder*, 641 F.3d 982, 985-86 (8th Cir. 2011) ("Congress enacted [the IIRIRA] in 1996 out of concern about proliferation of fraud in accessing various federal benefits restricted to United States citizens or certain eligible non-citizens."); Congressional Task Force on Immigration Reform, *Report to the Speaker: The Honorable Newt Gingrich* 33 (June 29, 1995) (describing "evidence of fraud committed by illegal aliens as a means to obtain public benefits").

admission into the United States. *E.g.*, *Valadez-Munoz v. Holder*, 623 F.3d 1304, 1306-07, 1309 (9th Cir. 2010), *cert. denied*, 132 S. Ct. 106 (2011); *Valenzuela-Solari v. Mukasey*, 551 F.3d 53, 54 (1st Cir. 2008). As with a passport, it is relatively straightforward to view obtaining entry to the United States as a benefit under federal law, such that false claims of U.S. citizenship made to immigration authorities to obtain entry would satisfy § 1182(a)(6)(C)(ii). *See Jamieson v. Gonzales*, 424 F.3d 765, 768 (8th Cir. 2005). And, finally, the provision has been invoked in the context of verifying a job applicant's eligibility to work in the United States. *E.g.*, *Kechkar v. Gonzales*, 500 F.3d 1080, 1088-84 (10th Cir. 2007); *Naser v. Gonzales*, 123 F. App'x 624, 624-25 (5th Cir. 2005) (per curiam). There is no question that § 1182(a)(6)(C)(ii) encompasses false claims of U.S. citizenship made during the employment eligibility verification process.[9]

---

[9] "Section [1182(a)(6)(C)(ii)] dovetails to another part of the IIRIRA that established systems for verification of work authorization . . . designed to prevent unauthorized employment and loss of jobs to noncitizens." *Sandoval*, 641 F.3d at 985. Section 1182(a)(6)(C)(ii) specifically applies to false claims of U.S. citizenship made for a purpose or benefit under 8 U.S.C. § 1324a, which regulates the private employment of immigrants. Among other things, § 1324a requires employers to verify employment eligibility using a form on which the employee "must attest, under penalty of perjury . . . that the individual is a citizen or national of the United States, an alien lawfully admitted for permanent residence, or an alien who is authorized by the Attorney General to be hired, recruited, or referred for such

With these precedents in mind, it is clear that the BIA's construction of the "purpose or benefit" language was, in this instance, "unmoored from the purposes and concerns" of the statute. *Judulang v. Holder*, 132 S. Ct. 476, 490 (2011). In giving his place of birth, Castro was not seeking a public benefit from the Paterson police, in the sense of a benefit created by law and administered by the police. The government stresses the potential adverse consequences of an arrest on Castro's application for adjustment of status and his lack of legal status at the time of his arrest. The various forms of relief from removal, including adjustment of status to permanent residence, would constitute "benefit[s] under . . . Federal . . . law" within the meaning of 8 U.S.C. § 1182(a)(6)(C)(ii). However, these are legal benefits that would be conferred or withheld by DHS, not the Paterson police.

At most, then, the "purpose or benefit" imputed by the BIA to Castro was to minimize the risk that the police would report his arrest to DHS. Minimizing that risk is not, in and of itself, a legal benefit. And, in fact, there was no risk. Palomino's testimony made clear that the Paterson police routine had no interest in Castro's citizenship status.

---

employment." 8 U.S.C. § 1324a(b)(2). Under § 1324a(b)(3), employers must retain a version of the employment eligibility verification form and make it available for inspection by federal government authorities upon request. Employers who fail to comply with § 1324a's documentation requirements are subject to civil penalties under § 1324a(e)(5). In effect, § 1324a makes employers the front line in the enforcement of federal laws governing employment eligibility.

28

Our assurance that 8 U.S.C. § 1182(a)(6)(C)(ii) does not embrace a false statement such as the one made by Castro is confirmed by a review of the only two published cases which, to our knowledge, address applications of the statute outside of the contexts discussed above (*i.e.*, passport applications, border entry, or employment eligibility verification). In *Dwumaah v. Attorney General*, 609 F.3d 586, 589 (3d Cir. 2010) (per curiam), this court upheld the BIA's determination that an individual was removable for falsely claiming to be a U.S. citizen on an application for a federal student loan. U.S. citizens are eligible for federal student loans, whereas undocumented immigrants are not. 20 U.S.C. § 1091(a)(5). By contrast, in *Hassan v. Holder*, 604 F.3d 915, 928-29 (6th Cir. 2010), the Sixth Circuit held that the government had not established that a false claim to U.S. citizenship made on a Small Business Administration ("SBA") loan application was made for a "purpose or benefit" under a federal law. The applicant's immigration status was irrelevant to the loan application, and no evidence suggested that the applicant believed that claiming to be a U.S. citizen would raise the probability that his application would be approved.

*Hassan* and *Dwumaah* both involve applications for legal benefits in the form of publicly supported loans. The difference in the two cases is the relevance of the applicant's citizenship status. In *Dwumaah*, being a U.S. citizen was a prerequisite to obtaining the student loan; in *Hassan*, being a U.S. citizen was immaterial to obtaining the SBA loan. Castro's statement that he had been born in Puerto Rico is, in this respect, indistinguishable from the statement in *Hassan*. Palomino testified that Castro's citizenship status had no bearing on the police department's handling of his arrest.

And the Paterson police department had no authority to confer a legal benefit on Castro by virtue of his citizenship status.

We do not purport to lay down an exhaustive interpretation of the circumstances to which 8 U.S.C. § 1182(a)(6)(C)(ii) might apply. We rule only that the statute did not apply to the facts of record here. Accordingly, we find that the BIA's construction of the statute was contrary to law, and the BIA abused its discretion in denying Castro's motion to reconsider its decision on this ground.

### III. Conclusion

For the reasons stated above, we will grant the petition for review and remand to the BIA for further proceedings consistent with this opinion. *See INS v. Ventura*, 537 U.S. 12, 16-17 (2002).